Phillip Daman Mass. Bar #601040 (*pro hac vice* )
Jeffrey Daman Pa. Bar #86509 (*pro hac vice*)
Daman and Associates
15 Court Square, Suite 800
Boston, Massachusetts, 02108
Tel. 617.221.3737, Fax. 424.645.0754
Email: phillip.daman@damanllp.com, Jeffrey.Daman@damanllp.com

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MISSOURI**

FREEDOM SMOKELESS

Plaintiff,

v.

RAPID DEVELOPMENT SERVICES, INC.; BRIGANTINE, INC; LEON GUREVICH, AND JOHN HOBSON,

Defendants.

**CASE NO.:**

**Complaint**

Judge:

1) Fraudulent Inducement
2) Intentional Misrepresentation
3) Negligent Misrepresentation
4) Conspiracy to Defraud
5) Conspiracy to Induce Breach of Contract
6) Breach of Contract
7) Unjust Enrichment
8) Breach of Good Faith and Fair Dealing
9) Negligence

COMES NOW Plaintiff, Freedom Smokeless, Inc. ("Freedom" or "Plaintiff), by and through its undersigned attorneys, and for its Complaint against Defendant, Rapid Development Services, Inc. ("Rapid"), Defendant Brigantine, Inc. ("Brigantine"), Defendant John Hobson, ("Hobson"), and Defendant Leon Gurevich ("Gurevich"), Plaintiff states as follows:

## PARTIES

1. Plaintiff is a California corporation, having its principal place of business in San Clemente, California.

2. Upon information and belief, Defendant Rapid is a Missouri corporation, having its principal place of business in St. Louis, Missouri.

3. Upon information and belief, Defendant Brigantine is a Missouri Corporation having its principal place of business in St. Louis, Missouri.

4. Upon information and belief, Defendant Hobson, is an individual and a citizen of Missouri.

5. Upon information and belief, Defendant Gurevich is an individual and a citizen of Missouri.

6. Collectively, Rapid, Brigantine, Hobson and Gurevich are referred to herein as "Defendants". Collectively, Plaintiff and all Defendants are referred to herein as the "Parties."

## JURISDICTION AND VENUE

7. This action arises under Missouri statutory and common law.

8. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.SC.§ 1332.

9. This Court has personal jurisdiction over Defendants in that Defendants reside or have their principal place of business within the State of Missouri and this district, and each and every one of them have performed acts related to the subject matter at issue in this action within the Eastern District of Missouri.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) and (c).

11. Venue is proper as Defendant's principal place of business is within this District.

12. In addition, Defendants consented to the jurisdiction and venue of this Court in the contracts described below.

## FACTS COMMON TO ALL COUNTS

13. Plaintiff is a technology company which specializes in the production of personal electronic vaporizer units, commonly referred to as "ecigs" or "electronic cigarettes".

14. Defendant Rapid is a company that claims to be able to design, create, install and service fully automated and semi automated machines that can: A) configure and assemble component parts and materials into electronic cigarettes, B) fill such assembled electronic cigarettes with a special liquid solution ("e-liquid"), and C) assemble, label, finish and fill electronic cigarettes so that they are ready for packaging.

15. Defendant Brigantine is a sales agent for Defendant Rapid.

16. Defendant Hobson is the owner and an employee of Defendant Brigantine.

17. Defendant Gurevich is an owner and employee of Defendant Rapid.

18. This action arises from Plaintiff's dealings with Defendants and Defendants' representations to Plaintiff from December 2012 through September 2014 with respect to machines that Plaintiff paid Defendant to design, create, supply, install and maintain for Plaintiff.

19. Defendant Rapid, on or about December 14, 2012, contracted with Plaintiff to design, create, install and maintain two fully automated machines for Plaintiff (the "12-14-12 Agreement").

20. One of material terms of the 12-14-12 Agreement was that each of the two machines that Defendant was to design, create, install and service for Plaintiff was to be capable of **both** assembling and then filling (with e-liquid) two different kinds of electronic cigarettes – non-rechargeable, limited use or "Disposable" electronic cigarettes ("Disposables") and, separately, disposable and non-refillable cartridges containing e-liquid that can be used in rechargeable, reusable electronic cigarettes ("Cartridges").

21. During the first two weeks of December, 2012, leading up to the agreement and execution of the 12-14-12 Agreement, Plaintiff had multiple oral and written communications with Defendants whereby Plaintiff communicated the details of what Plaintiff needed Defendant Rapid to create with regards to the functionality of the two fully automated machines.

22. During these communications, Plaintiff explicitly expressed to Defendants that it needed to hire a machinist that could design, create, install and maintain two fully automated machines for Plaintiff that would: A) produce both Disposables and Cartridges; B) at 240 parts per minute ("240 ppm"); C) with a 98% uptime (i.e. the machines would be running properly 98% of the time Plaintiff wanted to operate the machines) guarantee; D) that could prepare both Disposables and Cartridges for labeling and packaging and E) complete production, deliver and install both of these two fully automated machines at Plaintiff's premises within 12 to 14 weeks after an agreement was executed between Plaintiff and Defendant Rapid, as time was of the essence for Plaintiff.

23. During these communications between Plaintiff and Defendants, each and every Defendant represented to Plaintiff that Defendant Rapid was in fact able to create the two fully automated machines Plaintiff was seeking, and that Defendant could create these two fully automated machines pursuant to the specifications Plaintiff required as described above.

24. On or about December 9, 2012, prior to entering into the 12-14-12 Agreement, Rapid's sales agent, Defendant John Hobson made oral and written representations to Plaintiff that Defendant Rapid would in fact, be able to create two fully automated machines for Plaintiff, each machine being capable of assembling and filling both Disposables and Cartridges, in accordance with the other specifications described in paragraph 22 above, including the 12-14 week time line required by Plaintiff Freedom.

25. At the time of the making of these representations, Defendant Hobson, knew that Defendant Rapid was in fact not capable of producing the two fully automated machines pursuant to the specifications described above, including the time line required by Plaintiff Freedom.

26. On or about December 9, 2012, Defendant Brigantine, Inc., acting as Defendant's sales agent, represented to Plaintiff that Defendant Rapid would be able to create the two fully automated machines for

Plaintiff, each machine being capable of assembling and filling both Disposables and Cartridges and in accordance with the other specifications described above, including without limitation the 12-14 week time line required by Plaintiff Freedom.

27. At the time of the making of these representations, Defendant Brigantine Inc., knew that Defendant Rapid was in fact not capable of producing two fully automated machines pursuant to the specifications described above, including the 12-14 week time line required by Plaintiff Freedom.

28. On or about December 9, 2012, prior to entering into the 12-14-12 Agreement, Defendant Gurevich, as an individual, and as owner and employee of Rapid, represented to Plaintiff that Defendant Rapid would be able to create two fully automated machines for Plaintiff, each machine being capable of assembling and filling both Disposables and Cartridges, and in accordance with the other specifications described above, including the 12-14 week time line required by Plaintiff Freedom.

29. At the time of the making of these representations, Defendant Guervich knew that Defendant Rapid was in fact not capable of producing two fully automated machines pursuant to the specifications described above, including the time line required by Plaintiff Freedom.

30. On or about December 12, 2012, Defendants supplied Plaintiff with a detailed written proposal and price quote ("Proposal # 121211-4" or "PO #1") outlining the scope of work, pricing, and time frame for completion and delivery of the two machines.

31. PO #1 later became an integral part of the 12-14-12 Agreement.

32. Pursuant to the terms of the 12-14-12 Agreement, Defendant Rapid agreed to design, manufacture, deliver, install, program and service two fully automated machines pursuant to the specifications and time line described in paragraph 22 above.

33. On or about 12-14-12, and pursuant to the terms of the 12-14-12 Agreement, Plaintiff paid Rapid a deposit of $298,350 towards the contract price of $994,500.00, which included a $79,000.00 "expedite delivery fee", to ensure that the two fully automated machines would be completed, delivered, installed,

and operating at Plaintiff's place of business in California and per the specifications required by Plaintiff not later than 12 to 14 weeks after December 14, 2012, which works out to be on or before March 1, 2013.

34. To date, now over two years later, Defendant Rapid has still not completed production or delivered the two fully automated machines that Plaintiff ordered via the 12-14-12 Agreement.

35. To date, now more than two years later, Defendant Rapid refuses to return to Plaintiff the $79,000.00 Expedite Delivery Fee Plaintiff paid Rapid to ensure that the two fully automated machines Plaintiff be completed and delivered not later than March 1, 2013, despite the fact that delivery was not made before March 1, 2013, and still has not been accomplished.

36. Beginning with the Parties' discussions during the first two weeks of December 2012, and many times since Defendant Rapid and Plaintiff entered into the 12-14-12 Agreement, Defendant Rapid has deceived and intentionally misled Plaintiff with regards to Defendant Rapid's ability and intent to fulfill Defendant Rapid's obligations under the 12-14-12 Agreement.

37. Since December 14, 2012, Defendants have made numerous misrepresentations and false promises regarding Rapid's ability to complete the two fully automated machines.

38. In reliance upon Defendant's misrepresentations and false promises regarding the completion of the two fully automated machines, Plaintiff has paid Rapid an additional $ 1,298,040.00 since Plaintiff tendered the initial deposit. Including the initial deposit amount, Plaintiff has paid Rapid $1,596,390.00 for the creation of the two fully automated machines Plaintiff ordered.

39. To date, now more than two years later, and despite its failure to complete the two fully automated machines Plaintiff ordered, Defendant Rapid has refused to return the $1,596,390 Plaintiff has paid to Rapid on or about December 14, 2012 for the two fully automated machines Plaintiff paid to have created.

40. Between December 9, 2012 and April 13, 2013, Plaintiff repeatedly made Defendant Rapid specifically aware that Plaintiff needed Defendant Rapid to complete and deliver the two fully automated machines to Plaintiff prior to March 1, 2013 so that Plaintiff could produce product and fill orders

requested by Plaintiff's clients prior to April 13, 2013.

41. Defendant Rapid was, at all times beginning in December 2012 up until April 13, 2013, fully aware that it did not have the resources, experience or knowledge to complete the work Plaintiff needed at all, let alone by April 12, 2013 as required and contracted for in the 12-14-12 Agreement.

42. Rather than deal honestly with Plaintiff, Defendants, from the very beginning of their relationship lied to and mislead Plaintiff into believing that Rapid was capable of performing the work required by Plaintiff in the 12-14-12 agreement, and accepted payment for the same.

43. Furthermore, rather than deal honestly with Plaintiff, Defendants, knowing that Rapid did not have the ability to fulfill its obligations to Plaintiff under the 12-14-12 Agreement, and in an effort to induce Plaintiff to tender even more money, fabricated various reasons as to why Rapid would not be able to complete Plaintiff's two fully automated machines by the agreed upon time and fabricated various reasons as to why Plaintiff would have to tender additional payments to Rapid if it ever wished to have the two fully automated machines completed.

44. On or about February 1, 2013, Defendant Rapid contacted Freedom to notify Freedom that Rapid had not properly designed the gluing station component of the equipment and that these gluing stations would need to be modified and redesigned, delaying the timely completion of the two fully automated machines.

45. Defendant Rapid further informed Plaintiff on or about February 1, 2013, that Plaintiff would need to pay Rapid an additional $50,800.00 so that Rapid could "correct" the "faulty" design of gluing stations. Rapid refused to continue with its work unless this $50,800.00 was paid, despite the fact that Rapid had made the initial design and warranted that it would produce two working machines as specified.

46. Plaintiff, trusting Rapid as the purported "expert" tendered the additional $50,800.00 so that Rapid could ameliorate the supposed issue with gluing station.

47. On February 4, 2013 Plaintiff requested Rapid develop a vision inspection station (the "Inspection

Stations") to check for presence or absence of the ultraviolet adhesive around the circumference of the mouth piece and adjoining tube identifier. This station would also require rotation of the assembled part during. Defendant agreed to create these Inspection Stations for a cost of an additional $72,800.00, contingent upon Plaintiff sending a deposit of $36,400.00 by February 8, 2013.

48. Plaintiff, not suspecting any foul play, and still believing that Rapid would produce the machines in a time frame that was close enough to the originally contemplated March 1, 2013 fulfillment date set forth in the 12-14-12 Agreement, tendered an additional $36,400.00 for the Inspection Stations to Rapid by February 8, 2013.

49. Defendant, still aware of Plaintiff's April 13, 2013 deadline and after receiving the deposit for the Inspection Stations, reassured Plaintiff that Rapid would deliver the Plaintiff's machines on April 7, 2013, just a few weeks later than what Plaintiff and Rapid had agreed upon via the 12-14-12 Agreement. However, to this day Defendants have yet to complete the construction of Plaintiff's machines or of the Inspection Stations

50. Defendant made oral and written statements from February 1, 2013 through March 7, 2013 which mislead Plaintiff and falsely assured Plaintiff that Defendant Rapid would still in fact, meet the new deadline for delivery of the machines Rapid had promised of April 7, 2013.

51. Given Rapid's assurances, Plaintiff did not feel a delayed delivery date of April 7, 2013 would substantially or materially affect Plaintiff's relations with Plaintiff's clients and expected Rapid would deliver the completed machines by April 7, 2013, and therefore felt comfortable relying on Defendants' assurances and working with Plaintiff, rather than attempting to terminate the 12-14-12 Agreement.

52. In furtherance of its efforts to deceive Rapid and perpetuate its ruse, Rapid, between December 14, 2012 and September 18 2014, knowing it was completely incapable of fulfilling its obligations under the 12-14-12 Agreement, sent Plaintiff multiple written and oral communications indicating that despite their contractual obligation to the contrary, Defendant Rapid was not on schedule to not complete and deliver the two fully automated machines as promised by Defendant on or before March 1, 2013 as required by the 12-14-12 Agreement. Defendant Rapid, throughout the entire relationship between the Parties, continued

misrepresent its abilities to make these two fully automated machines and misled Plaintiff to believe that Rapid could complete the two fully automated machines, both before and sometime after the March 1, 2013 due date.

**FILLING THE 4.6 MILLION UNITS**

53. On or about March 8, 2013, Defendant Rapid notified Plaintiff that, despite Rapid's contractual obligation to complete the machines sooner, Rapid's completion would be delayed approximately 2 additional months, and that the two machines would not be ready until mid-June, 2013.

54. On or about March 18, 2013, Plaintiff, in anticipation of the delay of receiving its fully automated machines past April 7, 2013, requested that Defendants fill Cartridges and Disposables on the machines that Defendant was building for Plaintiff. Plaintiff made this request of Defendant due to the known demand and order placed by Plaintiff's customer. Plaintiff informed Defendant of Plaintiff's customer's demands and order at the time Plaintiff request Defendant perform this filling work.

55. Plaintiff did not yet realize, as of March 18, 2013, that Rapid was incapable of delivering the machines as contemplated or that Rapid, was perpetrating a ruse upon Plaintiff, and that Defendant never intended to deliver the machines as ordered.

56. On or about March 18, 2013 Rapid misrepresented and intentionally mislead Plaintiff into believing that Rapid would be able to fill approximately 4.6 million Disposables and Cartridges (the "4.6 Million Units") in order for Plaintiff to satisfy the demands of its clients. Defendant told Plaintiff that Defendant would be able to fill the 4.6 Million Units on the two automated machines that Plaintiff had promised it would deliver. Defendant Rapid was never able to complete the construction of the two automated machines and was only able to fill a portion of the requested 4.6 Million Units forcing Plaintiff to cover and seek another vendor to assist Plaintiff in completing this filling project.

57. On March 20, 2013, Rapid offered to fill the 4.6 Million Units Plaintiff needed at a cost of

$216,000.00, provided Freedom tendered a deposit a 50% deposit of $108,000.00 by March 22, 2013.

58. Freedom, in reliance upon Rapid's representations, promises and assurances, did in fact tender the $108,000.00. Rapid, at the time it made these representations, knew that they were false and that Rapid would not be able to complete the machines nor fill the 4.6 Million Units.

59. On April 12, 2013 and at several times prior, Defendant assured and promised Freedom that Defendant's two fully machines would in fact be completed shortly, and Defendant would be able to make good on its promise to Plaintiff to fill the 4.6 Million Units for Freedom using those two fully automated machines which could perform at a rate of 240 parts per minute.

60. On May 9, 2013, Plaintiff, asked Defendant to fill just Disposables (3.5 million total units, the "3.5 Million Units") and not fill Cartridges, due to the demand by its customer. A change order to add the filling of 2 million disposables was executed at a cost of $94,000.00, or $0.047 per unit for filling.

61. On July 22, 2013, Plaintiff received a communication from Hobson that Rapid would create the clean room needed for the filling to occur and Freedom sent and should begin production that week.

62. It became apparent to Plaintiff that Defendant Rapid would be unable fulfill its obligations with respect to meeting the agreed upon deadline for completion of the two fully automated machines.

63. Defendant Rapid was aware that Plaintiff was in desperate need of help in filling the 3.5 Million Units, as Plaintiff had already agreed to sell the 3.5 Million Units to Plaintiff's clients.

64. Defendant was not able to fill the 3.5 Million Units. As a result of Defendant Rapid's failure to fill the 3.5 Million Units, Freedom had contract with and use a third party to complete the task of filling the almost 3.5 Million Units so that Plaintiff could meet the expectation of its clients.

65. As a result of Defendant's failure to fill the 3.5 Million Units, Freedom had to expend extra and increased cost in filling the product from alternative sources and vendors, as Freedom was unable to realize the benefit of the bargain it had struck with Defendant. Defendant eventually filled approximately 600,000.00 units. Freedom was able to have the remaining of the 3.5 Disposable Units filled by this third party vendor, at an increased cost of $0.21 per unit.

66. Freedom, via this third party, filled approximately 2,326,000.00 units, at the added cost of $0.21 per unit. As such, Rapid's failure to perform cost Freedom $488,460.00.

67. On February 19, 2014, Defendant Rapid finally offered Plaintiff, via electronic mail, a credit, not a refund, on Plaintiff's account in the amount of $31,500.00. Rapid refused to refund these funds to Plaintiff. Rather, this credit could only be applied to future business with Rapid which further induced Plaintiff to rely upon Rapid's promises to Plaintiff's detriment.

68. On or about June 10, 2013 Defendant had still not completed production of the two automated machines contracted for in December 2012 and for which Plaintiff had paid Defendant a $79,000.00 rush fee to have completed by March 1, 2013. Rapid was fully aware that it was incapable of producing the machines that it had promised to Plaintiff and continued to conceal this fact from Plaintiff in an effort to retain

Plaintiff's business and receive more monies from Plaintiff.

**RAPID UNILATERALLY DECIDES TO CONVERT DUAL MACHINES TO SINGLE USE**

69. On or about June 10, 2013, Defendant had still also not filled the 3.5 Million Units as promised, and the two fully automated machines were not completed. Rather than tell Plaintiff honestly that Rapid was completely incapable of producing the two fully automated machines and filling the 3.5 Million Units as promised, Defendant once again misrepresented its abilities to Plaintiff in an effort to induce further payments and orders from Plaintiff.

70. Concealing the fact that they were incapable of completing the machines as promised, Defendants once again mislead Freedom into believing that Defendants could help Freedom if Freedom simply were to tender more money.

71. On or about June 10, 2013, Defendant Rapid represented to Plaintiff that, despite the terms of the 12-14-12 Agreement, Rapid was going to redirect its efforts and use the materials it had on hand to convert the unfinished, dual use fully automated machines Freedom had been waiting for and which were to produce both Cartridges and Disposables, into two fully automated machines that could produce Disposables only.

72. Defendant Rapid did not offer to refund any of the funds Plaintiff had paid since December 12, 2012 towards the creation, delivery, installation and maintenance of

the two fully automated machines that could produce both Cartridges and Disposables. Plaintiff still maintained its expectation that its order for two fully automated machines would be completed as agreed to between itself and Rapid.

73. On September 9, 2014 Freedom requested an update regarding two fully automated machines ordered on December 14, 2012. Defendant refused to provide any more information regarding the status of these long overdue machines.

74. Since December 14, 2012, Freedom had tendered additional funds totaling over $2.7 million to Defendant with the expectation that Rapid would deliver the two fully automated machines Freedom ordered on December 14, 2012, but Rapid has not delivered any of the machines or other items required by the 12-14-12 Agreement.

75. To date, Defendant has refused to tender the 2 fully automated machines despite Freedom's payments to Defendant for these 2 fully machines totaling $1,596,390.00 of the total $2.7 Million tendered to Defendant Rapid.

76. As a direct result of Defendant's actions, Freedom has lost substantial profits and incurred significant costs that could have otherwise been avoided.

77. As a direct result of Defendant's actions Freedom has suffered lost business in amount of at least $30 million dollars. Freedom still is without such machines and continues to suffer additional lost

business in an amount to be proven at trial.

78. As a direct result of Defendants' actions as described herein, including Rapid's failure to deliver the two fully automated machines as agreed upon, Freedom suffered irreparable harm. Freedom lost value and profit in being able to sell Freedom's business to active suitors. Additionally as a direct result of Defendants' actions Freedom was forced to shut down its operations and close its business.

**FIRST CAUSE OF ACTION: FRAUDULENT INDUCEMENT**

(Against Hobson, Brigantine, Gurevich and Rapid)

79. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 78 as though fully set forth herein.

80. On or about December 09, 2012, Defendant Hobson as a sales agent of Brigantine authorized to act on behalf of Rapid, entered into communications with Plaintiff for the express purpose of inducing Plaintiff to enter into a sales agreement with Defendant Rapid whereby Plaintiff would make a purchase from Rapid.

81. Hobson initiated these conversations for the sole purpose of securing a deal between Plaintiff and Defendant Rapid, so that Hobson could secure a commission payment from Rapid as result of any deal Hobson could negotiate for Rapid with Plaintiff.

82. Hobson, during the first two weeks of December 2012, and in order to secure a contract for Rapid for which Hobson would be compensated, made fraudulent statements to Plaintiff, regarding Rapid's ability to complete the work Plaintiff needed.

83. In preparing these fraudulent statements, Hobson colluded with Brigantine, Gurevich and Rapid.

84. During these first two weeks of December 2012, Hobson, Brigantine, Gurevich, and Rapid colluded with one another to develop materials and statements for the express purpose of inducing Plaintiff into a contract with Rapid.

85. Defendants, together and each individually, knowingly misrepresented to Plaintiff that Defendant Rapid had the experience, expertise and capabilities to perform the work Plaintiff needed.

86. Despite repeatedly making written and oral statements to the contrary during the first two weeks of December 2012, Defendants knew Rapid was not able to make the two fully automated machines Plaintiff was requesting.

87. Furthermore, despite repeatedly making written and oral statements to the contrary during the first two weeks of December 2012, Defendants knew Rapid was not able to make the two fully automated machines Plaintiff was requesting in the 12-14 timeframe that Plaintiff was requesting.

88. Defendants, knowingly and intentionally misled Plaintiff into believing that Rapid could perform the work Plaintiff was requesting so that Defendants could each earn funds resulting from an agreement between Plaintiff and Rapid.

89. Hobson, together with Brigantine, Gurevich and Rapid, during the first two weeks of December 2012, crafted oral and written statements designed to induce Plaintiff to tender nearly $1Million dollars to and hire Rapid to create the two fully automated, Disposable and Cartridge machines.

90. Knowing Rapid did not have sufficient expertise, experience or abilities to perform the work Plaintiff needed to be completed, Defendants knowingly prepared and supplied Plaintiff with false and misleading oral and written statements in an effort to induce Plaintiff to contract with Rapid to build these two fully automated machines for a cost of nearly $1Million.

91. Knowing Rapid did not have sufficient expertise, experience or abilities to perform the work Plaintiff needed to be completed within 12-14 weeks after the date Plaintiff were to order the same, Defendants prepared and presented Plaintiff with misleading and false information regarding Rapid's ability to design, create, install and service two fully automated machines each capable of producing Disposables and Cartridges within 12-14 week timeframe after the date ordered by Plaintiff.

92. In reliance upon Defendants' misleading oral and written communications, false representations and assurances made during the first two weeks of December 12, 2012, Plaintiff did, in fact, enter into the 12-14-12 Agreement with Rapid. Plaintiff, in furtherance of this agreement tendered $298,350 (a 30% deposit of the agreed upon contract price) to Rapid. This contracted amount of $994,500 included a $79,000 expedite fee to ensure that the two fully automated machines would be completed, delivered, installed, and operating at Plaintiff's place of business in California per the specifications requested by Plaintiff not later than 12 to 14 weeks after December 14, 2012.

93. The fraud and deceit of Defendants herein alleged was not discovered by Freedom until on or about August 28, 2014, a date within three years before the commencement of this action.

94. Freedom discovered that contrary to common practice within the industry, Rapid never conducted an engineering study prior to starting its work for Freedom and never conducted an such study throughout the course of the relationship between the Parties. Rapid concealed this fact from Freedom.

95. As a result of defendants' actions, Freedom has suffered damages in an amount of $30 million dollars.

**SECOND CAUSE OF ACTION: INTENTIONAL MISREPRESENTATON**

(Against Hobson, Brigantine, Gurevich and Rapid)

96. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 95 as though fully set forth herein.

97. Beginning or about December 9, 2012 and continuing through August 28,2014, Defendants, misrepresented that Rapid had the resources, expertise, experience and abilities to create two fully automated machines each capable of assembling and filling both Cartridges and Disposables.

98. On or about March 18, 2013 through October 5, 2013 Defendants intentionally and repeatedly misrepresented to Plaintiff's that Rapid would be able to fill the 4.6 Million Units.

99. During the times when Defendants made these misrepresentative statements to Plaintiff, Defendants were aware that Rapid was in fact, not capable of: 1) Producing the two fully automated machines and 2) filling the 4.6 Million Units as required by the 12-14-12 Agreement.

100. In reality, Defendants manipulated the written and anecdotal information provided to Plaintiff's to further Defendants' deception with respect to both projects.

101. Freedom justifiably relied upon Defendants' repeated misrepresentations, entered into a series of agreements and tendered a total of $2.7 million dollars to Rapid as a direct and proximate result of Defendants' misrepresentations.

102. The fraud and deceit of Defendants herein alleged was not discovered by Freedom until on or about August 28, 2014 a date within three years before the commencement of this action. Freedom, despite its best efforts and due diligence, did not discover the fraud and deceit of the defendant until this date.

103. As a proximate and foreseeable result of defendant's misrepresentations, Freedom sustained damages in an amount of $30 million.

**THIRD CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION**

(Against Hobson, Brigantine, Gurevich and Rapid)

104. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 103 as though fully set forth herein.

105. Plaintiff is informed and believes that Defendants negligently made the factual representations set forth above without any reasonable grounds for believing those representations to be true.

106. The fraud and deceit of the Defendants herein alleged was not discovered by Freedom until on or about August 28, 2014, a date within three years before the commencement of this action. Freedom, despite its best efforts and due diligence, did not discover the fraud and deceit of the Defendants until this date.

107. As a result of Defendant's negligent misrepresentations Plaintiff sustained damages in an amount of $30 million.

**FOURTH CAUSE OF ACTION: CONSPIRACY TO DEFRAUD**

(As to All Defendants)

108. Plaintiff incorporates by reference each and every allegation contained in paragraphs 1 through 107 as though fully set forth herein.

109. During the first two weeks of December 2012, Defendant Hobson, entered into conversations with Gurevich as an agent for Rapid n their individual capacity and as as agents for Rapid. During these communications Defendants planned and collaborated on how they could best defraud Plaintiff.

110. Defendants, during these early December 2012 conversations, determined that they could secure a large sum of money from Freedom by misrepresenting Rapid's abilities to Freedom and then securing

funds from Freedom in the form of deposits towards work Rapid misrepresented it was capable of completing on Freedom's behalf.

111. Defendants conspired to misrepresent to Freedom that Rapid was capable of producing the two fully automated machines in the time frame Plaintiff required them.

112. Knowing Rapid did not have the ability to create the two machines Plaintiff required, and knowing that Rapid could not create the machines in the time frame required by Plaintiff, Defendants prepared and supplied knowingly false and misleading oral and written information to Plaintiff in an effort to secure an agreement and nearly $1million from Freedom.

113. In reliance upon Defendant's misleading oral and written communications, false representations and assurances, Freedom did, in fact, enter into an agreement with Rapid and tendered a deposit in the amount of $298,350 (30%) and committed to the full Purchase Order for $994,500.00, which included an expedite fee of $79,000.00 to ensure the work was completed by March 1, 2013.

114. Separately, on or about March 18, 2013 through October 5, 2013, Defendants intentionally and repeatedly misrepresented to Plaintiff's that Rapid would be able to fill the 4.6 Million Units, Plaintiff needed filled by April 21, 2013.

115. Rapid offered to fill the 4.6 Million Units Plaintiff needed at a cost of $216,000.00 provided Freedom tendered a deposit a 50% deposit of $108,000.00 by March 22, 2013.

116. Freedom, in reliance upon Defendants' fraudulent statements, misrepresentations, false promises

and false assurances, did in fact tender $108,000.00 to Rapid as a deposit towards the cost of filling the 4.6 Million Units.

117. On April 12, 2013and at several times prior, Defendant assured and promised Freedom that Defendant's two fully automated machines would in fact be completed shortly, and that once completed, Defendant would be able to make good on its promise to Plaintiff to fill the 4.6 Million Units for Freedom at 240 parts per minute.

118. Defendants, at the time they made its December, 2012 and April, 2013 representations, knew they were false and that Rapid would not be able to complete the two fully automated machines nor fill the 4.6 Million Units as promised.

119. Defendants promised and represented to Freedom that Rapid was capable of and would in fact produce the two fully automated machines not later than March 1, 2013, and agreed to fill the 4.6 Million Units not later than April 21, 2013. Freedom, as a result of Defendants' fraudulent statements and false promises, tendered to Rapid from December 2012 through April 2013, $1,596,390.00 towards the creation of the two fully automated machines and $108,000.00 towards filling the 4.6 Million Units. The total amount fraudulently taken from Rapid from December 2012 through April 2013 therefore totaled $1,704, 390.00 ($1,596,390.00 + $108.000.00).

120. Rapid, to date, has never completed the two fully automated machines and never filled the 4 Million Units as requested.

121. Rapid and each and every other Defendant, knew that Rapid were incapable of completing both projects in the manner and time requested by Freedom.

122. All Defendants conspired together to mislead Freedom into believing Rapid could in fact complete both projects as requested.

123. Rapid was aided and abetted in furtherance of this fraud by Hobson, Brigantine and Gurevich as agents for Rapid from December 2012 through August 2014.

124. With consent and ratification from all Defendants, Rapid misinformed Freedom as to Rapid's abilities with respect to the work Freedom required.

125. On or about December 9, 2012, Defendants Hobson, acting as an agent of Brigantine and Rapid, and Gurevich, acting as an agent of Rapid and as agents of Rapid knowingly and willfully conspired and agreed among themselves to defraud Plaintiff Freedom with respect to the two fully automated machines Plaintiff required.

126. On or about March 18, 2013, Defendants Hobson, acting as an agent of Brigantine and Rapid, and Gurevich, acting as an agent of Rapid, and as agents of Rapid knowingly and willfully conspired and agreed among themselves to defraud Plaintiff Freedom with respect to the Rapid's ability to fill the 4.6 Million Units.

127. With continued consent and ratification from all Defendants, Rapid, did, in fact, fraudulently represent that Rapid was able to complete the work requested and took $1,704, 390.00 from Plaintiff from December 2012 through April 2014 with respect to both projects.

128. Defendants Hobson, Brigantine, Gurevich,, and Rapid did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

129. Plaintiff is informed and believes and thereon alleges the last overt act in pursuance of the above described conspiracy occurred on or about September 18, 2014, on which date defendant Rapid requested additional funds from Plaintiff with respect to the work Rapid promised but failed to perform and which Rapid knew could not perform. Rapid materially and fraudulently represented it could complete the work Plaintiff requested with the consent and ratification of Hobson, Brigantine, or Gurevich at all times.

130. Although this conspiracy was perpetrated by Defendants in both their respective capacities as agents and managers of Rapid and Brigantine, Gurevich, and Hobson may nonetheless be held personally accountable under for their personal participation in tortious or criminal conduct, even when performing their duties as managers or agents.

131. As a proximate result of the wrongful acts herein alleged, Plaintiff has been generally damaged.

132. As a proximate result of the wrongful acts herein alleged, Plaintiff has been specifically damaged.

133. As a result of Defendants' actions, Freedom has suffered specific damages in the amount of $1,704, 390.00 and continues to suffer additional monetary damages in the amount of 18% per annum.

134. In doing the things herein alleged, defendants acted with malice, oppression, and fraud. Defendants were therefore guilty of malice, oppression and fraud in conscious disregard of Freedom's rights, thereby warranting an assessment of punitive damages in an amount appropriate to punish defendants and deter others from engaging in similar misconduct.

## FIFTH CAUSE OF ACTION: CONSPIRACY TO INDUCE BREACH OF CONTRACTS

(Against All Defendants)

135. Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 134, inclusive, as if set forth herein.

136. On or about December 14, 2012, Plaintiff and Rapid entered into a written agreement for the production of two fully automated machines.

137. On or about March 1, 2013, Defendants, and each of them, knowingly and willfully conspired and agreed among themselves to damage the Plaintiff by depriving Freedom of the benefits of the 12-14-12 Agreement by inducing Rapid to breach said contract.

138. Pursuant to such conspiracy, and in furtherance thereof, defendants Hobson, Brigantine, and Gurevich acting in their individual capacities and as agents of Rapid, did wrongfully allow Rapid, with their consent and ratification, to fail to complete construction, deliver and install the two fully automated machines Freedom had commissioned Rapid to produce.

139. On or about March 18, 2013, Plaintiffs, entered into an agreement in Orange County, California with Rapid, to have Rapid fill the 4.6 Million Units for Plaintiff to be completed on or about August 7, 2013. Defendants Hobson, acting in his individual capacity, as well as an agent of Brigantine and Rapid, and Defendant Gurevich, acting in his individual capacity as well as an agent of Rapid, knowingly and willfully conspired and agreed among themselves to defraud Plaintiff Freedom with respect to the Rapid's ability to fill the 4 Million Units.

140. As a proximate result of Defendants' wrongful acts pursuant to the conspiracy herein alleged, Rapid, did wrongfully breach both the December 12, 2012 and March 18, 2013 contracts with Freedom by respectively: 1) Failing to produce the two fully automated machines for Plaintiff by March 1, 2013 as promised and 2) Failing to fill the 4 Million Units for Plaintiff as promised.

141. Freedom has performed all conditions, covenants, and promises under the contracts.

142. Defendants' last overt act in pursuit of conspiracy with respect to the two fully automated machines occurred on or about September 14, 2014, when they aided and allowed Rapid to represent to Plaintiff that Rapid had performed its obligations to Plaintiff and was due additional funds with respect to the two fully automated machines.

143. Defendants' last overt act in pursuit of conspiracy with respect to the filling of the 4 Million Units occurred on or about March 20, 2013, when they aided and allowed Rapid to represent to Plaintiff that Rapid would be able to fill the 4 Million Units in return for a deposit from Plaintiff of $108,000.00.

144. Although this conspiracy was perpetrated by Defendants in their respective capacities as agents and managers of Rapid and Brigantine, Hobson and Gurevich may nonetheless be held personally accountable for their personal participation in tortious or criminal conduct, even when performing their duties as managers.

145. As a proximate result of the wrongful acts herein alleged, Freedom has been generally damaged.

146. As a proximate result of the wrongful acts herein alleged, Freedom has been specifically damaged.

147. As a result of Defendants' actions, Freedom has suffered specific damages in the amount of $1,704, 390.00 and continues to suffer additional monetary damages in the amount of 10% per annum.

148. In doing the things herein alleged, defendants acted with malice, oppression, and fraud. Defendants were therefore guilty of malice, oppression and fraud in conscious disregard of Freedom's rights, thereby warranting an assessment of punitive damages in an amount appropriate to punish defendants and deter others from engaging in similar misconduct.

**SIXTH CAUSE OF ACTION: BREACH OF CONTRACT**

(As to Rapid)

149. Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 147, inclusive, as if set forth herein.

150. In violation of the terms of the 12-14-12 Agreement, Rapid has failed to deliver the two fully automated machines ordered by Plaintiff.

151. To date, Plaintiff has paid Rapid $1,596,390.00 dollars, including an expedite fee in the amount of $79,000.00 to ensure these two fully automated machines would be completed, delivered and installed before March 1, 2013.

152. In reliance of Rapid's December 14, 2012 promise to complete the two fully automated machines as ordered, Plaintiff leased space to house and use the machines. Plaintiff to date has spent approximately $69,717.50, on a lease of space to store the product to be manufactured.

153. In addition, Plaintiff has suffered consequential damages, including without limitation lost business opportunities, being unable to satisfy orders placed with Plaintiff, and foregoing the opportunity to be acquired by another company. To date these damages have been in excess of $32 Million dollars.

154. In violation of the terms of the March 18, 2013 Agreement, Rapid failed to fill and deliver the 4.6 Million Units ordered by Plaintiff by April 21, 2014.

155. Rapid was able to fill slightly over half of the units requires. As a direct result of Rapid's failure to fill the 4.6 Million Units, Plaintiff had to expend an extra and increased cost in filling these products as Freedom was unable to realize the benefit of the bargain it had struck with Defendant.

156. Freedom was eventually able to have the 4.6 Million Units filled by this third party vendor, at an increased cost of $0.21 per unit.

157. Freedom was eventually able to have the 4.6 Million Units filled via a third party. Freedom filled approximately 2,326,000.00 units at an added cost of $0.21 per unit, costing Freedom $488,460.00 (the "Cost to Cover").

158. As a result of Rapid's actions, Freedom has suffered damages in the amount of $1,596,390.00 dollars which is the amount of money it has tendered to Rapid for the two fully automated machines which were never completed, $69,717.50 in lease payments, at least $32 million in consequential damages, plus $488,460.00 with respect to the Cost to Cover. Freedom has therefore suffered at least $34,154,567.50 dollars in damages and continues to suffer additional monetary damages in the amount of 10% per annum.

**SEVENTH CAUSE OF ACTION: UNJUST ENRICHMENT**

(All Defendants)

159. Plaintiff re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 158, inclusive, as if set forth herein.

160. Defendants, acting in concert and pursuant to an unlawful conspiracy, acquired various property owned by Freedom, including millions of dollars, high end electronic parts and components, technological information, valuable plans and schematics, and valuable market information.

161. With consent and ratification from Hobson, Brigantine, and Gurevich, Rapid misled Plaintiff from December 2012 through August 2014, in an effort to induce Plaintiff to tender millions of dollars to Rapid and so that Rapid could abscond with the same without ever performing the work requested of Rapid by Plaintiff.

162. With continued consent and ratification from Hobson, Brigantine, and Gurevich, Rapid did, in fact receive millions of dollars, high end electronic parts and components, technological information, valuable plans and schematics, and valuable market information from Plaintiff.

163. Rapid purposefully, willfully and maliciously failed to tender the two fully automated machines Plaintiff's ordered.

164. Rapid purposefully, willfully and maliciously failed to fill the 4.6 Million Units Plaintiff ordered.

165. As a result of Defendants' wrongful acts and omissions, Defendants have been unjustly enriched to the Plaintiff's detriment.

166. Plaintiff therefore demands restitution and judgment against Defendants in an amount of not less than $30 million to be determined at trial, together with interest, attorneys' fees, and the costs of this action.

167. Further, in doing the things herein alleged, Defendants acted intentionally, willfully, fraudulently and maliciously in an attempt to injure Plaintiff in their trade, business or profession. Therefore, Plaintiff is entitled to exemplary and punitive damages in an amount according to proof at trial.

## EIGHTH CAUSE OF ACTION

## FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

(As Against All Defendants)

168. Freedom repeats and re-alleges paragraphs 1through 167, inclusive of this Complaint and incorporates the same herein as though fully set forth.

169. Defendants' oral and written agreements with Plaintiff raise an implied covenant of good faith and fair dealing under Missouri law.

170. As a result of the action of Defendants described above, Defendants have violated the implied covenant of good faith and fair dealing. Defendants repeatedly deceived and lied to Plaintiff and misrepresented their ability and intentions to create the machines Defendant Rapid had agreed to create for Plaintiff.

171. Defendants' breaches are incompatible with the precepts of good faith and fair dealing as they were willful, malicious, and in bad faith. As a proximate and foreseeable result of Defendants' breaches, Plaintiff suffered damages including but not limited to the diminution in value of Plaintiff's merchandise, loss of business accounts, and the loss of monies, a sum presently known to be$30 Million. Plaintiff reserves the right to seek leave of Court to amend this Complaint and insert the full amount of said damages when the same are ascertained.

## NINTH CAUSE OF ACTION FOR NEGLIGENCE

(As to Rapid)

172. Plaintiff repeats and re-alleges and incorporates herein by reference the allegations of paragraphs 1 to 172, inclusive, as if set forth herein.

173. Rapid, prior to entering into the December 14, 2012 agreement, failed to conduct any appropriate research or studies, including but not limited to an engineering study, regarding to how Rapid might best engineer the two fully automated machines Rapid assured Freedom it could build.

174. Rapid, at no time after entering into the December 14, 2012 agreement, ever conducted any appropriate research or studies, including an engineering study, regarding to how Rapid might best engineer the two fully automated machines Freedom requested.

175. Rapid has never shared any engineering study with Plaintiff with respect to the two fully automated machines Plaintiff ordered under the December 14, 2012 agreement.

176. Rapid prior to entering into the March 18, 2013 agreement, failed to conduct any appropriate research or studies, including an engineering study in regards to how Rapid might best fill the 4 Million Units Plaintiff commissioned Rapid to fill.

177. Rapid, at no time after entering into the March 18, 2013 agreement, ever conducted any appropriate research or studies, including an engineering study, with regards to how Rapid might best fill the 4 Million Units Plaintiff commissioned Rapid to fill.

178. Rapid has never shared any engineering study with Plaintiff with respect to how Rapid might best fill the 4 Million Units Plaintiff commissioned Rapid to fill.

179. Rapid has never conducted any engineering study with respect to any of the work Plaintiff commissioned Rapid to complete.

180. Rapid has never shared any engineering study with Plaintiff with respect to any of the work Plaintiff commissioned Rapid to complete from December 14, 2012 through current.

181. Rapid had a duty to Plaintiff to conduct research including an engineering study to determine how to best manufacture the machines Plaintiff was requesting.

182. Rapid knew or should have reasonably known to conduct meaningful research including but not limited to an engineering study with respect to the work Plaintiff requested Rapid perform regarding the two fully automated machines Plaintiff ordered from Rapid pursuant to the December 14, 2012 agreement.

183. Rapid knew or should have reasonably known to conduct and engineering study with respect to the work Plaintiff requested regarding the filling of the 4 Million Units Plaintiff ordered via the March 18, 2013 agreement.

184. Rapid knew or should have reasonably known to conduct and engineering study with respect to the work Plaintiff requested regarding all machines Plaintiff commissioned Rapid to undertake for Plaintiff from December 14, 2012 through August 28,2014.

185. Rapid, at all times during its business relationship with Plaintiff, failed to take meaningful and appropriate steps, including any research that may have been needed, to prepare itself so that it could manufacture the two fully automated machines Plaintiff commissioned via the December 14, 2012.

186. Rapid owed Plaintiff a duty to take such meaningful and appropriate steps, and such failure directly and proximately caused Plaintiff to incur significant, unnecessary and reasonably foreseeable damages including additional costs, lost profits, and ultimately caused the near total collapse of Plaintiff's business operations.

187. Rapid, having failed to conduct an engineering, feasibility or any other kind of study, continuously claimed to require more money from Freedom to create fixes to problems that should have been known to Defendant prior to the commencement of work as the same would have been routinely been discovered by an engineering, feasibility or any other kind of study.

188. Plaintiff has incurred damages which are the direct and proximate cause of Rapid's negligence in the amount of $34,154,567.50 million dollars.

## ON ALL CAUSES OF ACTION

Wherefore, Plaintiff Freedom seeks an order requiring Defendants, jointly and severally:

1. To pay $1,596,390.00 plus interest from December 14, 2012;
2. To pay $488, 460.00 plus interest per from March 20, 2013;
3. To pay $30,000,000.00;
4. For the cost of suit Plaintiff has incurred including attorneys fees;
5. For damages the Court finds Plaintiff is entitled to as a consequence of Defendants' negligence;
5. For exemplary and punitive damages in an amount according to proof at time of trial; and
6. For anyu such other relief as the court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues.

DATED: May 7, 2015

Respectfully submitted,
DAMAN & ASSOCIATES

BY:

Phil Daman, Esq.
Jeffrey Daman, Esq.

Attorneys for Freedom Smokeless, Inc.